THE FIDELITY INVESTMENT ASSOCIATION, Plaintiff in Error, *vs.* LOUIS L. EMMERSON, Secretary of State, Defendant in Error.

*Opinion filed October 28, 1925—Rehearing denied December 3, 1925.*

1. SECURITIES—*annuity contract is not contrary to public policy.* The ordinary form of annuity contract, whereby, in consideration of a series of payments running through a number of years, a person or corporation agrees to pay at a fixed time a definite sum of money or to pay a definite sum in fixed installments at certain times, is not opposed to any principle of law or public policy.

2. SAME—*Secretary of State cannot determine amount of return a security should promise investor.* There is no rule of law or principle of public policy which gives the Secretary of State discretion to determine the amount of return which securities should promise to the investor before they can be sold in Illinois, and so long as the contract is free from fraud, neither the Secretary of State nor the courts can determine the wisdom of entering into the contract by any person or class of persons nor the amount to be returned to the investor above the amount invested.

3. SAME—*annuity contract is not fraudulent because its provisions must be read together to be understood.* The universal rule

of construction that all parts of a contract must be considered together applies to an annuity contract, and such contract is not fraudulent merely because each clause, standing alone, cannot be understood without reference to some other clause.

4. SAME—*annuity contract need not provide for return of all payments in event of surrender before maturity.*  There is no public policy of the State which requires that annuity contracts shall provide for their surrender before maturity and the return to the holder of all payments he has made in case he desires to withdraw, and such contract is not fraudulent because it provides that a part of the amount paid in shall be charged against a holder desiring to withdraw, to cover the expense of procuring the contract.

5. SAME—*an association engaged in sale of annuities is not engaged in banking business.*  An association engaged in the sale of annuities by the ordinary form of annuity contract, whereby, in consideration of a series of payments running through a number of years, it agrees to pay at a fixed time a definite sum of money or to pay a definite sum in fixed installments at certain times to the contract-holder, is not engaged in the banking business, as the payments made are not in the nature of bank deposits and do not create the relation of debtor and creditor but are made in compliance with the obligations of the contract, and the fact that advancements are loaned on the contract does not make it a banking business where no notes are given or discounted.

HEARD, J., took no part.

WRIT OF ERROR to the Appellate Court for the Third District;—heard in that court on appeal from the Circuit Court of Sangamon county; the Hon. ELBERT S. SMITH, Judge, presiding.

GOOD, CHILDS, BOBB & WESCOTT, BROWN, HAY & STEPHENS, ELMER D. BROTHERS, and McCAMIC & CLARKE, (JAMES W. GOOD, WALTER E. BEEBE, CLAUDE F. SMITH, ESTHER A. DUNSHEE, and CHARLES McCAMIC, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, (CLARENCE N. BOORD, A. D. RODENBERG, JAMES W. GULLETT, GEORGE E. DIERSSEN, B. L. CATRON, WILLIAM C. CLAUSSEN, and MORTIMER C. GROVER, of counsel,) for defendant in error.

Mr. CHIEF JUSTICE DUNN delivered the opinion of the court:

By a writ of *certiorari* the plaintiff in error, the Fidelity Investment Association, has brought before us for review the record of the Appellate Court for the Third District, which affirmed a judgment of the circuit court of Sangamon county affirming an order entered by the Secretary of State terminating and canceling the right to make further sales under the authority which had been previously granted to the Fidelity Investment Association. The Secretary of State assumed to act under paragraph 2 of section 24 of the Illinois Securities law, which provides that "the Secretary of State shall also have the power at any time, after five days' notice to the seller of securities, when insolvency exists or when in the opinion of the Secretary of State the further sale of such securities would work or tend to work a fraud upon purchasers thereof, to suspend or cancel permission to sell such securities in this State," and the order set forth the reasons upon which it was founded. The circuit court finds that the order of the Secretary of State is sustained by the evidence and it is therefore affirmed. The Appellate Court entered a general judgment of affirmance, which its opinion shows to have been based upon the view that the plaintiff in error was engaged in the banking business without authority of law and was violating the provisions of the general Incorporation act, that its business was therefore unlawful and its contracts void and for this reason worked a fraud upon purchasers, which justified the order canceling the authority of the plaintiff in error.

The Fidelity Investment Association is a corporation which was organized under the laws of the State of West Virginia in 1912 for the purpose of purchasing, acquiring, buying, selling, owning, holding, disposing of and dealing in stocks, bonds, mortgages, debentures, obligations and other

securities of corporations and persons for its own account and for others on commission, or loaning money on real estate or personal security, acquiring, owning, dealing in and selling real estate, and, among other things, "to acquire and sell and offer for sale or delivery any contract, certificate or bond, of any person, association or corporation, now or hereafter engaged in this State in the business of soliciting, or receiving deposits or payments of any kind of annuity contracts, certificates of annuity bonds; and further to engage in the business of placing or selling certificates, bonds, debentures, certificates of interest or investment securities of any kind on the partial payment, installment, or any other plan of payment, and providing for the sale, redemption or retiring of the same or any part thereof; and generally to carry on all lawful business necessary or incidental to all or any of the above mentioned objects." On March 8, 1915, the plaintiff in error was granted a license under the general Incorporation law to do business in the State of Illinois, which authorized it "to purchase, acquire, buy, sell, own, hold, dispose of and deal in stocks, bonds, mortgages, debentures, obligations and other securities of corporations and persons, for its own account and for others on commission, * * * and to make, sell and deliver the negotiable coupon-bearing or registered promises of the corporation to pay specific sums of money, on specific dates and to pledge its property and assets in payment thereof." Since it was licensed to do business in the State the plaintiff in error has been engaged in selling annuities. After the passage of the Illinois Securities law in 1918 the Secretary of State authorized the sale of stocks, bonds and other securities within the State of Illinois by the plaintiff in error. The only business which has been transacted in this State by the plaintiff in error has been the sale of its contracts for annuities, and incidental thereto the collection of the required payments from the purchasers and the advancement to its contract-holders, from time to time, of a por-

tion of the reserve maintained to enable plaintiff in error to make the ultimate payments required of it by such contracts.

During its operation in this State the plaintiff in error has used five forms of contract. No two of them have been used during the same time, but from time to time the form previously in use has been discarded and a new form substituted, which was, after such substitution, the only form used until it was in turn discarded for a later form. The forms in use during the several periods of time were designated as No. A, B, C and D, and Special Income Contract, which was submitted to the Secretary of State for his approval in December, 1920, and no objection being made to it, in January, 1921, the plaintiff in error ceased to issue the D-contract and began to solicit applications for and to issue its Special Income Contract, which was the only form thereafter sold. The following is a specimen of this contract:

"$2000.                                                    $2000.

*Special Income Contract*
FIDELITY INVESTMENT ASSOCIATION
Wheeling—West Virginia

"Covenants and guarantees to pay to the registered owner of this contract an annual income of two hundred dollars for a period of ten years, as evidenced by the income coupons for that amount attached hereto and subject to the terms thereof, being in all the sum of two thousand dollars, or in lieu thereof, if the aforementioned income coupons be surrendered for cancellation, there shall be paid the several amounts as provided by the terms of the interest coupons forming part of this agreement together with the sum of fifteen hundred dollars, payable in ten annual installments of one hundred and fifty dollars each, as evidenced by the income coupons for that amount attached hereto and subject to the terms thereof, or in lieu of either income there will be paid in cash its commuted value as provided in section 12 of the Privileges and Conditions.

*Surplus*

"In addition on the first day of August, 1935, provided all payments have been made hereon as stipulated, the registered owner will be paid from the surplus defined in section 2 of the Privileges and Conditions such an amount as shall be apportioned to this contract by the board of directors.

"The consideration for this contract is the application which is made a part and the further consideration of the payment of sixty dollars, to be known as the initial payment, and in addition thereto, beginning with the month of January, 1925, the payment of ten dollars on the fifteenth day of each month for one hundred twenty-six consecutive months, to be known as monthly payments.

"It is expressly provided and agreed that this contract is issued and accepted subject to the terms and requirements of the interest and income coupons attached hereto, which, together with the Privileges and Conditions printed on the last page of this agreement, are made a part of this contract as if printed on the face hereof.

"Issued at the home office, Wheeling, West Virginia, this the ........day of................19....

W. B. IRVINE, *President*.

........................, *Secretary*."

This is followed by the second page containing the ten income coupons for $200 each mentioned in the contract, under the heading:

"*These income coupons available only if interest coupons be not cashed.*

"The ten attached income coupons of $200 each, forming part of Income Contract Number E, will be signed by the treasurer upon presentation at any time after all payments have been made as required by the terms of said contract, and provided that at the time of such presentation all interest coupons together with the income coupons for $150 each, originally issued as part hereof and attached hereto be surrendered for cancellation."

These coupons are identical, except the date of payment and number. They are numbered from 1 to 10 and are payable one in each year, beginning eleven years and six months after the date of issue of the contract. The following is a copy of the coupon:

"*Income Coupon*                    On The
FIDELITY INVESTMENT ASSOCIATION         First
                                        Day of
Wheeling—West Virginia                  Aug.
                                        1944
will pay to the registered owner of the income contract of which this coupon forms a part, two hundred dollars.

"This coupon is not payable unless signed by the treasurer as provided for in the paragraph at the top of this    Income
sheet.                                                      Contract
                                                           Number E
No. 1—$200.            ........................*Treasurer*."

The third page of the contract contains the heading:

*"These income coupons are not available unless the ten income coupons for $200 each forming the preceding sheet be surrendered for cancellation.*

"The ten attached income coupons for $150 each forming part of Income Contract Number E will be signed by the treasurer upon presentation at any time after all payments have been made as required by the terms of said contract, and provided the coupons for $200 each issued as part of same have been surrendered for cancellation as provided on the face of said contract."

—and ten coupons which are identical with the preceding ten, except that the amount of each is $150 instead of $200. Below these coupons, on the same page, appears the following heading:

*"These interest coupons are not available unless the ten income coupons for $200 each forming the preceding sheet be surrendered for cancellation.*

"Upon surrender for cancellation of the income coupons for $200 each as provided on the face of this contract, these interest coupons will be signed by the treasurer and be payable any time after maturity provided the initial payment and all monthly payments due prior to such maturity have been made on Income Contract Number E, of which they form a part."

Beneath this heading appear nine coupons numbered from 1 to 9, inclusive, a copy of the first of which is as follows:

*"Interest Coupon*

"Provided all payments previously due have been made on the income contract of which this coupon forms a part, Fidelity Investment Association, Wheeling, West Virginia—will pay to the registered owner, fifteen dollars, with 4½ interest after maturity, computed annually.    On The First Day of Aug. 1928

"This coupon is not payable unless signed by the treasurer as provided for in the paragraph printed immediately above No. 1—$15.    Income Contract Number E

..............................*Treasurer.*"

The rest are identical with the first, except the date of payment, which is a year later in each successive coupon after the first, and the amounts, which are, successively,

twenty-one, twenty-seven, thirty-three, thirty-nine, forty-five, fifty-one, fifty-seven and thirty-one and 50/100 dollars.

The fourth page is headed "Privileges and Conditions," and a copy of it follows:

"Section 1. Reserve.—This contract is one of a class designated specifically as 'Special Income Contracts' and all identical contracts of whatever denomination shall be so considered. The association hereby covenants and agrees to maintain a reserve fund for the retirement of all such income contracts which shall at any time be not less than the total amount then payable under the terms and provisions thereof, the same to be invested in approved securities and deposited in trust in accordance with the laws of the State of West Virginia.

"Section 2. Surplus.—The surplus referred to on the face hereof is any surplus resulting from the reserve fund established out of moneys paid in on contracts of this class and earnings thereon over and above the amount necessary to mature such contracts.

"Section 3. Paid-up contract.—Provided the initial payment and all monthly payments covering a period of thirty-six months or any subsequent period of twelve months have been made hereon, this contract may be surrendered with all unpaid coupons attached and there will be issued to the registered owner a paid-up income contract for one or the other of the sums shown in the paid-up income schedule hereof for that time, depending on whether any interest coupon hereof has been cashed or not. The income coupon forming part of any paid-up contract for which this may be exchanged shall bear the same maturity date as the income coupons attached hereto. An assignment of such paid-up income contract will be accepted as full collateral security for any loan remaining unpaid on this contract at the time of such exchange.

"Section 4. Non-forfeiture and new contract.—This contract is non-forfeitable and should payments hereon be

discontinued before it is eligible to exchange for a paid-up income contract, the registered owner at any time following such a discontinuance may surrender this contract and receive a new income contract for the same amount, the maturity date of such new contract to be determined by allowing as a credit thereon and applying as a payment covering a period preceding the date of re-issuance the total amount paid in on this contract, provided that with the surrender of this contract there shall be paid a re-issuance fee of two dollars and the payment due on the new contract for the month in which the exchange is made.

"Section 5. Grace in making payments.—In the event of a delinquency in making any payment, the registered owner may at any time within one year following the first default make all then past due payments with interest on each thereof from its due date at 6% per annum. Unless such payment be made within the time specified this contract shall thereafter be eligible only to the paid-up or new contract privilege, to which it may be entitled as herein elsewhere provided.

"Section 6. Loan assignment.—The assignment of this contract with all unsurrendered income coupons and unpaid interest coupons attached will be required as collateral security for any loan made hereunder.

"Section 7. Loan-deduction.—The amount of all loans remaining unpaid will be deducted from any loan made hereon or settlement made hereunder.

"Section 8. Loan continuing payments.—Provided the initial payment and twelve monthly payments have been made hereon, and no loan remains unpaid, the association upon request, but for the purpose only of then making payments in advance to the number of not more than twelve, will loan the amount required.

"Section 9. Loan advance.—Provided the initial payment and all monthly payments covering a period of twenty-four months or any subsequent period of twelve months

have been made hereon, the association will loan at any time within one year following the expiration of any such period, one or the other of the sums shown in the advance loan schedule hereof for that time, depending on whether ˙ any interest coupon has been cashed or detached herefrom, deducting from the proceeds of the loan such an amount as may be required to complete the payments covering the twelve months' period in which the loan is made.

"Section 10.   Loan-interest.—Interest on loans and on renewals of same shall be payable annually in advance, but any part of the sum borrowed may be re-paid at any time before maturity, interest being retained only for the actual time the loan remains unpaid.

"Section 11.   Loan-renewal.—Any loan hereunder will be made within ninety days following receipt of written application for same and will be renewed at maturity upon request.

"Section 12.   Commuted value.—At the maturity of the first or any subsequent $200 income coupon forming a part of this contract the association, subject to the right to require ninety days' prior written notice, will pay to the order of the registered owner the amount shown in the commuted value schedule hereof for that time, upon presentation of the coupon then due and the surrender for cancellation of this contract with all unmatured coupons attached.   The commuted value of any income coupons for different amounts will be in exact proportion.

"Section 13.   Assignment.—This contract when properly assigned will be registered in the name of the assignee upon presentation to the association at its home office for transfer and the payment of a transfer fee of one dollar. Until so registered no assignment shall be binding on the association.   The association assumes no responsibility as to the validity or effect of any assignment.   Any person who acquires this contract or any coupons therefrom by assignment or otherwise, accepts the same subject to all the

provisions hereof and any and all equities then existing or which may afterwards accrue between the association and the assignor.

"Section 14. In event of death.—In the event of the death of the applicant prior to the completion of the payments hereon, he or she then being the registered owner hereof and no payment required hereon being in arrears more than ninety days, this contract may be terminated at any time within six months after such decease and upon satisfactory proof of death there will be paid the full amount of all payments made hereon and the face value of all matured interest coupons remaining unpaid at the time of such decease. Or the legal representative of any registered owner may continue this contract to maturity. In no case shall the termination and withdrawal privilege of this section be available or effective unless this contract is one originally issued upon the application referred to on the face hereof, or is a contract issued upon surrender of such originally issued contract within one year following the discontinuance of payments on such original contract.

"Section 15. Payments.—The payments provided in this contract both to and by the association are due and payable at its home office and payments due the association if made elsewhere will not be binding upon it unless made upon receipt bearing the signature of the president or secretary and countersigned by an agent with written authority to collect. Notice.—No agent of this association or other person has authority to alter, amend or vary this contract in any way. No interlineations, erasures or additions hereon will be recognized by the association. The owner by the acceptance of this contract thereby warrants to the association that the complete terms of the contract between him and the association are contained and wholly set forth in this contract itself, and the application therefor and in the privileges and conditions aforesaid, and not otherwise.

| PAID-UP INCOME SCHEDULE REFERRED TO IN SECTION 3 | | | ADVANCE LOAN SCHEDULE REFERRED TO IN SECTION 9 | | | COMMUTED VALUE SCHEDULE REFERRED TO IN SECTION 12 | |
|---|---|---|---|---|---|---|---|
| At Expiration of | Paid-up Contract if Interest Coupons Are Not Cashed | Paid-up Contract if Interest Coupons Are Cashed | At Expiration of | Loan Value if Interest Coupons Are Attached and Unpaid | Loan Value if Interest Coupons Are Paid or Detached | At Maturity of | Commuted Value if Interest Coupons Are Not Cashed |
| 36 Months | $540. | $515. | 24 Months | $300. | $300. | 1st Income Coupon | $1,620. |
| 48 " | $750. | $685. | 36 " | $435. | $419. | 2d " | $1,441. |
| 60 " | $950. | $840. | 48 " | $576. | $537. | 3rd " | $1,316. |
| 72 " | $1,140. | $975. | 60 " | $723. | $653. | 4th " | $1,183. |
| 84 " | $1,315. | $1,090. | 72 " | $876. | $767. | 5th " | $1,042. |
| 96 " | $1,480. | $1,190. | 84 " | $1,035. | $879. | 6th " | $893. |
| 108 " | $1,635. | $1,275. | 96 " | $1,200. | $987. | 7th " | $734. |
| 120 " | $1,855. | $1,375 | 108 " | $1,371. | $1,093. | 8th " | $566. |
| 126 " | $2,000. | $1,500. | 120 " | $1,548. | $1,164. | 9th " | $388. |

If the contracts sold by the plaintiff in error were void, clearly the sale of them would be a fraud on the purchasers and the order of the Secretary was properly made. The validity or invalidity of the contract was therefore a proper question for the consideration of the Secretary upon this investigation. The contract, of which a specimen has been set out above, if fully performed by each party according to its terms, is simple and easily understood. The purchaser would pay $60 in cash and agree to pay $10 a month for 126 months,—ten and a half years,—and would thus discharge his entire obligation. The plaintiff in error would agree to pay the purchaser $200 at the expiration of eleven and a half years and $200 each year thereafter for nine more years, and would further agree to pay out of the sur-

plus arising from the investment of the funds for raising the annuity, the equitable proportion applicable to each contract. Very little calculation is necessary to show that if each party performed these terms the purchaser of the contract would pay in ten and a half years $1320 and would then receive $2000 in ten annual payments, beginning one year after full payment of the $1320. This is an ordinary form of contract, whereby, in consideration of a series of payments running through a number of years, a person or corporation agrees to pay at a fixed time a definite sum of money, or to pay a definite sum in fixed installments at certain times. In the first case the payment is of an endowment; in the latter of an annuity,—not in the original technical sense of an incorporeal hereditament, but in the modern sense of a chose in action providing an annual payment. There is nothing in such contracts opposed to any principle of law or public policy. (*Curtis* v. *New York Life Ins. Co.* 217 Mass. 47; *Mutual Benefit Life Ins. Co.* v. *Commonwealth,* 227 id. 63; *Cahill* v. *Maryland Life Ins. Co.* 90 Md. 333; *Berry* v. *Doremus,* 30 N. J. L. 399; *Commonwealth* v. *Metropolitan Life Ins. Co.* 254 Pa. 510; *Mutual Life Ins. Co.* v. *Smith,* 106 C. C. A. 593.) The General Assembly has recognized the validity of such contracts in the act of 1907 prescribing the conditions and provisions of life insurance policies, section 6 of which, as amended in 1909, provides: "This act shall not apply to annuities, industrial policies, or to corporations or associations operating on the assessment or fraternal plan: *Provided,* that in every case where a contract provides for both insurance and annuities this act shall apply to that part of the contract only which provides for insurance, but every such contract providing for a deferred annuity on the life of the insured only shall (unless paid for by a single premium) provide that in the event of the non-payment of any premium after three full years' premiums shall have been paid, the annuity shall automatically become converted into a

paid-up annuity for such proportion of the original annuity as the number of completed years' premiums paid bears to the total number of premiums required under the contract."

The findings of the Secretary on which his order is based contain no intimation that it had ever been suggested that the contracts were not valid and binding or that any complaint on that score had ever been thought of. Those findings and the order are as follows:

"(1) The application of the Fidelity Investment Association was among the first to be presented in the administration of the present Illinois Securities law, and the provisions of the investment contract submitted and in use escaped the attention and consideration of the members of the Securities Department.

"(2) Numerous, apparently justifiable, complaints of 'one-call system' methods of sale have been received, also such acts as showing bank bills bearing the name of W. B. Irvine, the president of the said Fidelity Investment Association.

"(3) The investment contract is indefinite, ambiguous and not susceptible to interpretation by the ordinary purchaser of such contracts, and does not make a full and complete disclosure of all the conditions in such a way that the ordinary purchaser can understand said contract.

"(4) The agencies in control so manipulate the business that the investor who makes payment for ten and one-half years to maturity of contract, paying in one thousand three hundred twenty ($1320) dollars and receiving only one thousand five hundred thirty-six ($1536) dollars at the end of said period, net only approximately four per cent simple interest, while standard securities of the country yield investors six to seven per cent, payable quarterly, and not at the end of ten and one-half years.

"(5) In the proposed modified form of contract no withdrawal value is provided for those unable to carry or make

the payments until the initial and twelve monthly payments have been made, and the surrender privileges allowed, where the contract has been carried one year, gives the investor less than one-half of the money actually paid by him; *i. e.,* on a contract one hundred eighty ($180) dollars has been paid in at the end of one year, a cash surrender value of eighty-eight ($88) dollars may be taken, but the investor must wait three months to receive this amount.

"(6) Investors unable to carry or make payments one year or over have no cash surrender or loan privileges whatever, these payments lapse and the unfortunate lose all the payments made.

"(7) It appears that the lapsed payments, less expenses incurred, are placed in the reserve account of the company and a substantial profit must accrue from this source; also the fiscal agents receive a considerable amount of each application regardless of whether the investors are able to continue their monthly payments and further, the amount paid the fiscal agency appears excessive and absorbs an undue portion of the profits.

"(8) It is not at all likely that many persons would invest if the contract was simple and plain and fully understood by the purchasers, and a security which is so worded, phrased and cleverly drawn that it is not and cannot be readily understood by the investor is not a fit security to be offered generally and to persons not skilled in construing such complex and complicated instruments.

"(9) Numerous hearings and conferences on the subject have been held at which counsel and the officers of the company presented fully the contention and position of the company, but the modified form of investment contract presented is not different in principle from the contract as formerly and now used, and as it does not eliminate lapses or forfeitures it is objectionable and offends against fair dealing, although the degree is to some extent lessened, as

the former contract provided merely a loan privilege at the end of two years.

"(10) The plan provides for the forfeiture of payments under certain conditions, and provides for a loss in the event of surrender before maturity, contrary to public policy and to the established legislative policy of this State; and

"It is therefore the opinion and holding of the Secretary of State that further sales under the authority heretofore granted under the present, or if made under the proposed modified form of contract, would work or tend to work fraud upon purchasers within the meaning of section 17 of the Illinois Securities law, and the right to make further sales is hereby terminated and canceled."

The first finding, that the application of the plaintiff in error was among the first to be presented in the administration of the Illinois Securities law and that the provisions of the investment contract submitted escaped attention and consideration, is merely by way of explanation. The question for the consideration of the Secretary was whether the securities of the plaintiff in error, the annuities which it was selling under its form of Special Income Contract, would work a fraud or tend to work a fraud upon investors. Whether the contract is indefinite and ambiguous and not susceptible to interpretation by the ordinary purchaser of such contracts, and does not make a full and complete disclosure of all the conditions in such a way that the ordinary purchaser can understand such a contract, must depend upon the language of the contract. The only complications in connection with the contract arise out of the provisions made to meet conditions growing out of the failure of the purchaser of the contract to perform his agreements, and these provisions all have for their object the keeping of the contract in force so that there shall be no forfeiture for non-compliance of the contract-holder because of temporary inability or failure to perform his agreement in full. The part of the contract headed "Privileges and Condi-

tions" deals in its different paragraphs with the various conditions which arise from the failure of the contract-holder to make the agreed payments at different times. The contract itself is plain and simple in dealing with all conditions and questions which may be anticipated to arise and on its face bears no evidence of fraud or tendency to fraud, and no evidence appears in the record of any such fraud or tendency to fraud on the part of the plaintiff in error.

The fourth finding of the order is that the agencies in control so manipulate the business that the investor who makes payment for ten and a half years to maturity of the contract, paying in $1320, receives only $1536 at the end of the period, netting only approximately four per cent simple interest, while standard securities of the country yield six to seven per cent, payable quarterly. There is no evidence in the record of any unfair manipulation of the business of the plaintiff in error, and there is no rule of law or principle of public policy which gives the Secretary of State discretion to determine the amount of return which securities should promise to the investor before they can be sold in the State of Illinois. The finding is contrary to the fact, for the contract provides that the commuted value of the $2000 at the expiration of eleven and one-half years, at the time of the maturity of the first coupon, shall be $1620, and in addition to that the contract-holder's proportion of the surplus to be distributed to his contract, which is entirely ignored.

The payments which the association agrees to make are specifically stated on the first page of the contract. The surplus in which the owner of the annuity will be entitled to participate is fully defined in section 2 of the Privileges and Conditions as the surplus above the amount necessary to mature all Special Income Contracts, resulting from the reserve fund which the plaintiff in error agrees by section 1 to establish and maintain for the retirement of all such con-

tracts. If default is made in any payment, the owner may, at any time within one year of the first default, make the past-due payments, with interest. If he fails to make payment within the year, even then he has his election to take a paid-up contract or a new contract on the terms provided in sections 3 and 4 of the Privileges and Conditions. Section 4 provides that there shall be no forfeiture, but that if payments are discontinued before the contract is eligible to exchange for a paid-up income contract, the owner may surrender his contract and receive a new one for the same amount, its maturity to be determined by allowing as a credit and applying thereon the total amount paid on the original contract, provided that the surrender of the old contract shall be accompanied by a re-issuance fee of two dollars and the payment due on the new contract for the month in which the exchange is made. After the first year's payments have been made the association agrees to loan, upon request, for the purpose of making payments in advance, not more than twelve in number, the amount required. After payments have been made for twenty-four months, or any subsequent period of twelve months, the association agrees to lend the owner, within one year after the expiration of any such period, one or the other of the sums shown in the advance loan schedule for that time, depending upon whether any interest coupon has been cashed or detached. The contract is assignable, and in the event of the death of the owner before the completion of payments thereon, no payment being in arrears over ninety days, the contract may be terminated at any time within six months and all payments made thereon will be paid, together with all unpaid interest coupons, or the legal representatives of the deceased owner may continue the contract to maturity.

The contract cannot fairly be said to be indefinite, ambiguous or difficult to understand. Its terms are plainly and concisely stated, so that they can be understood by a per-

son of ordinary intelligence who will take the trouble to read it carefully and try to understand it. The only difficulty in understanding any part of the terms arises from the effort to provide carefully for the rights affected by the failure of the contract owner to perform his agreement. This definition of rights is necessary for his protection. It is true, as counsel for the defendant in error complain, that each clause of the contract, standing alone, cannot always be construed without reference to some other clause. It is, of course, impossible to state all the terms of the contract in a single sentence, and the universal rule of construction that all parts of a contract must be considered together in its construction applies to this contract. Each change of condition brought about by the owner's default at various periods is provided for in separate paragraphs and the changed rights are defined in plain language. There is nothing in the scheme or plan of the contract having any element of fraud. Neither the wisdom of entering into the contract by any person or class of persons, nor the amount to be returned to the investor above the amount invested, is for the Secretary of State or the court to determine so long as the contract is free from fraud.

An objection made to the contract is that in its proposed modified form it provides for no withdrawal value until the first year's payments have been made in full, and that the amount of such withdrawal at the end of the first year is less than half the amount of the first year's payments. These contracts are entered into with reference to a series of regular payments to be made monthly for 126 months. The expense of procuring the contract is incurred at the beginning. It is not unreasonable,—at least it is not fraudulent,—if it is agreed that if the contract-holder desires to withdraw from the contract at the end of the first year a part or all of the expense to the association of obtaining his contract which is canceled should be charged against him in the settlement. There is no public policy of

the State which requires that annuity contracts shall provide for their surrender before maturity and in such case shall require the return to the contract-holder of all the payments he has made. The act which has been previously referred to, which requires in certain cases of annuity contracts that the annuity in case of non-payment of premium shall automatically be converted into a paid-up annuity, requires such paid-up annuity only after the payment of three full years' premiums, and, so far as this indicates any public policy, it is not inconsistent with the provisions of the plaintiff in error's contracts in regard to paid-up annuities or loan or surrender values.

The plaintiff in error is not engaged in the banking business. Counsel for the defendant in error say in their brief that the contract is for loaning money, which is a banking function, as well as the receiving of deposits and discounting of notes. By the acts of 1895 and 1897 any corporation formed under the laws of any other State or country and authorized by its charter to invest or loan money may invest or loan money in this State. The only loans which the contract contemplates and which the plaintiff in error makes are advancements made from the reserve to contract-holders, and these are not banking loans. The contract, taken in regard to such advancements, is not a promissory note and does not bind the contract-holder to the re-payment of the amount advanced. The first lines of the contract are in the form of a promissory note. They are followed by the statement of various conditions, which conclude as follows: "My liability hereunder shall be enforced in case of my default only by cancellation of said contract and application of the reserve as above provided, and not otherwise. Upon such cancellation and application all my right, title and interest in said contract and all my liability upon this promise shall cease and determine absolutely and the amount I have received hereunder be deemed the cash sur-

render value of said contract." Loans made in the course of the banking business contemplate a personal liability of the borrower for the re-payment of the money, while this advancement expressly excludes such liability. The making of these advancements is not the business in which the plaintiff in error is engaged, but is a mere incident of the business of making these contracts, which it is licensed to make. The plaintiff in error discounts no notes. The instrument executed by the contract-holder upon the advancement of money to him has none of the elements of a promissory note. It is not evidence of a debt but merely of a charge against an annuity contract. The plaintiff in error received no deposits, though the counsel for the defendant in error argue that the payments stipulated for in the contract are bank deposits. A deposit of money in a bank creates the relation of debtor and creditor. The payments by the contract-holders to the plaintiff in error create no such relation. They are made in compliance with the obligation of their contract, which is discharged by the payment. The money is not received by the plaintiff in error for safe keeping, to be returned to the payor or to be transmitted to any other place or used for any designated purpose. It is paid in fulfillment of the obligation of the contract, and when it is received it becomes the money of the plaintiff in error. The moneys collected are in fact transmitted to Wheeling, West Virginia, and are there invested, but it is not for the purpose of such transmission that they are made. They become a part of the general funds of the plaintiff in error, to be used by it in its business, not to be returned to the person making the payment and not subject to his order or direction.

It is contended for the defendant in error that the contracts of the plaintiff in error were sold upon fraudulent representations made by its agents, and that the plaintiff in error deliberately trained and instructed its agents in trick-

ery, for the purpose of selling its contracts by fraudulent, misleading and deceptive misrepresentation. The sale of the contracts in Illinois was made through Irving & Sisson, who were employed as fiscal agents of the plaintiff in error and had exclusive charge of such sales and the employment of agents for that purpose. The printed instructions given to such agents by Irving & Sisson were in evidence, and the testimony of several purchasers of contracts was introduced for the purpose of showing that they had been deceived in the purchase of their contracts and were misled as to the effect of them. Some of this testimony was contradicted but some of it was not. The instructions contained no material mis-statement and authorized none. The order of the Secretary of State was not based upon any finding of fraud in the manner of making the sales, as to which the only findings were contained in paragraph 2 of the order which has been quoted. It is apparent that the order was not based upon the methods followed in presenting the annuity contracts to prospective purchasers but upon the contract itself. Whether the Secretary of State has the authority to suspend or cancel permission to sell securities which have been authorized to be sold because the methods of some agents employed in their sale would work or tend to work a fraud upon purchasers is not presented by this record, for the Secretary has made no such order.

The judgments of the Appellate Court and the circuit court are reversed and the order of the Secretary of State is set aside.                                      *Judgment reversed.*

Mr. JUSTICE HEARD took no part in this decision.